# Bruce N. Smith. Ph.D.

Clinical Psychology
1407 W. 31st Ave. Suite 602
Anchorage, Alaska 99503
Telephone (907) 272-4741
Fax (907) 272-4730
Brucesmithphd@aol.com

## Summary of Psychological Testing

March 19, 2006

Vernon Risinger
DOB: 3/18/1945
Dates of testing: 7/20, 7/29, 8/18/2005, 1/19/2006
Age at testing: 21

**Referral:**
Mr. Risinger was referred by Allan Dayan, Attorney for a sex offender risk assessment to aid in sentencing. Mr. Risinger was found to be in possession of child pornography on his computer and had purchased and downloaded images of child pornography from Internet sites.

**Tests Administered:**
  Clinical Interview with Vernon
  MCMI-III
  MSI-II
  MMPI-2

**Collateral Information:**
1) Interview with Laura Risinger (sister-in-law) 1/19/2006
2) Letter to Judge Sedwick from Vern Risinger undated
3) Letter's of Character Reference from Family and Neighbors
4) Letter to Judge Sedwick from Robert Witt Jr. 4/15/2006
5) Transcript of FBI Interview with Vern Risinger 3/22, 6/13, 6/14, 6/17, 7/7/2005
6) Affidavit for Search Warrant 6/8, 7/12/2005
7) Search Warrant 6/8/2005 with Attached Inventory 6/15/2005
8) Search Warrant 7/12/2005 with Attached Inventory

1

**Summation of Collateral Information:**
Following CyberTip reports, the National Center for Missing and Exploited Children (NCMEC) analysts accessed a web site where they found numerous images of child pornography. On February 14, 2005, an administrative subpoena was served to Yahoo!Inc. They reported that the log in name in question belonged to Vernon Risinger. Mr. Risinger was put under surveillance and on June 13, 2005 the FBI executed a search warrant on his property. During the search, agents seized computers belonging to Mr. Risinger and discovered several photos depicting child pornography. During a "Consensual" interview with Vernon on June 13, 2005, he admitted he had been downloading child pornography from the internet for the past several years and had a large collection of child pornography on his computers. Vernon was noted to define child pornography as an image depicting an adult having sex with someone under age.

During a second interview with the FBI on July 7, 2005 Vernon admitted that he had purchased another computer, connected it to the internet, and was looking at and downloading adult pornography. Vernon stated to the agents that he had not downloaded any child pornography and gave consent for a search. During the search, agents discovered approximately eight images of females between the ages of ten and fourteen nude from the waist down in various sexual poses. Mr. Risinger admitted he had inadvertently viewed a web page containing child pornography but denied he had downloaded any images onto his computer.

In interview with the FBI on July 7, 2005 Vernon stated that he has not as an adult had sexual contact with minors. He reported he has had sexual fantasies involving children but he has never acted on them. Vernon acknowledged an attraction to his brother's daughter Lindy who is now in her twenties. He stated that he had never been sexually inappropriate with Lindy. Vernon also stated to the agents that as a teenager while babysitting he did have sexual contact with young children but he stopped doing this by the time he had become an adult.

Laura Risinger is married to Vernon's brother Allen. She stated that Vernon was the shy one out of the five boys in the family. She and Allen have two daughters who are now thirty-three and twenty. Laura stated there has never been a time when the girls expressed any form of discomfort around Vernon. Laura did state that she has noticed some changes in Vernon since his head injury in 1999 while working as a longshoreman. These include poor judgment and the use of profanity. Laura helped care for Vernon during his convalescence. She stated she was aware that Vernon was in to visual pornography as he had several books on his bedstand. She stated that it was his business in his own room. They even had an agreement that if Vernon passed away Laura would get rid of his video porn collection. Laura had another observation. She stated that when Vernon shops he buys more than one item and all the attachments. She stated "It fits perfectly with his personality that he would go to a site, download everything, then look at his leisure.

2

In his letter to the judge, Vernon characterized himself as a loner. He stated he was embarrassed and self-conscious around the opposite sex. He reports he was so shy he never dated. He also considered himself to have two physical deformities; a collapsed pectoral muscle and a small penis. Vernon reported his only sexual contact as an adult was an attempt at intercourse with a prostitute. He reported "I was scared of getting VD and could not get it up". He reported that he viewed pornography via magazines and then video tapes. After he got satellite tv, he subscribed to several adult channels. He reported he was fascinated with girl-girl sex and had a collection of over fifty two hour tapes. After his accident Vernon stated he had a lot of time on his hands and began using the computer to access pornography on the internet. He stated that some of the pop-ups were of child pornography and he was curious to know what young girls look like. Vernon stated that he was looking for adolescent and young teen pictures and videos.

All the letters of character reference by family, friends, and neighbors indicate that they held Vernon in high esteem and no one has reported even the suspicion of inappropriate sexual contact between Vernon and any minor female.

**Interview with Vernon:**
Vernon was interviewed at the evaluator's office. Vernon presented as a man of medium build who appeared his stated age. He was alert and oriented. His affect was guarded. Thought processes were logical and coherent, although definitely outside societal standards when it came to his views on pornography. Limits to confidentiality and informed consent issues were discussed and Vernon understood the nature of the evaluation process. He was personable and compliant with the evaluation process. He did appear socially awkward, and referred to himself as a "loner". Vernon appeared to be open regarding his use of pornography.

Vernon stated the following by way of explaining the nature of the problem. He began viewing pornography on the Internet while recuperating at home from an industrial accident in 1999. He stated as he had nothing to do he got into surfing the net and the porn sites he visited led to child sites. Vernon stated that prior to 1999 he bought and rented videos and subscribed to satellite pornography channels. He states his primary sexual interest had always been in lesbian scenes. Vernon acknowledged that this shifted to child porn and anything out of the ordinary. He stated that he did search for younger girls engaged in sex with each other but what he found was almost all heterosexual. Vernon explained that when he goes to a site he downloads everything there. He stated that he was not aware he had 81,000 images. He also stated that the 1000 images picked out by the prosecutor were "really really bad- really really young". Vernon claimed that those images did not interest him but admitted that it was among the stuff he downloaded.

3

Vernon stated that after he got involved in downloading that he joined a few child pornography sites. He acknowledged over the last couple of years he has paid a couple thousand dollars to child pornography sites. Vernon stated that as he was not interacting with anyone, he considered his viewing "no harm, no foul". He stated he did know the possession of child pornography was illegal. After the first search warrant and seizure of his pornography and computers, Vernon states he had the impression that adult pornography was not off limits. He went out and bought a lap top computer and was "trying to get back the stuff, especially lesbian sites because that's my thing". Vernon states that there was a lot of pornography on the lap top and only eight thumbnails involving child porn. He also stated "I just couldn't justify in my mind not having the internet to contact others for building supplies". Vernon stated that had he known it would lead to third party custody, he never would have done it. He stated however that his nickname on the job as a longshoreman is "tunnel vision" and he has that on his license plate. He stated he is a collector and hoarder and that in this case it led to the volume of his downloaded images.

Vernon reported that he was as honest as he possibly could be with the FBI. He stated that in their interview he had sexual contact with children when he babysat. Vernon stated it basically a couple instances when a girl was sleeping and he peeked. He stated that was the worst case scenario and there was no touching or intercourse. He reported the only other incident was looking when the kids would take a bath. Vernon reported one other incident prior to babysitting when he was ten and a friend's sister was six or seven. He states it was a "touching type of thing". Vernon noted on the MSI-II that he had one experience as a pre-teen of having a man pick him up and want to engage in mutual masturbation. Other than those childhood experiences, Vernon stated he was too shy to date or approach girls his own age. His only attempted intercourse was when he was twenty-one and attempted to have sex with a prostitute. Vernon reported he did not get an erection. He also reported as the years went by it got easier and easier to be in a non-dating situation. He stated that pornography has been his release his whole life. Vernon acknowledged an attraction to his niece Lindy and stated he enjoyed watching her but there was never any inappropriate contact with her. Vernon acknowledged he has attraction to women and children but denies fantasizing about them. He maintains that pornography is his sole form of sexual outlet.

**Brief History:**
The following is based on Vernon's self-report and is not corroborated by independent sources. It therefore reflects Vernon's perception of person, place, and time. Vernon reported he was born in Detroit, Michigan and at age five moved to Anchorage where he was raised. Vernon is the oldest of five boys.

Vernon described his father as "first rate". He stated that he was friendly, outgoing and had a lot of friends. His dad did not discipline but "On the rare occasion he got pissed you knew it". Vernon states he did not get into trouble

4

much as he was less gregarious than his brothers and more socially isolated. His father drank alcohol in moderation. The family was Lutheran and attended church when Vernon was growing up. He reported it "never did anything for me". His father died in 1990 from a long illness.

Vernon described his mother as "always there for you". She was the disciplinarian and would sometimes use a broom. She worked outside the home. Vernon remembered her as a good mother and they use to go hunting and fishing with her. His mother died of lung cancer in July 2005.

Vernon reported his schooling was uneventful. He stated that in grade school he liked science and shop. However he reported that he skipped a lot of school and would come home and curl up with a book. He stated he was introverted and had a small circle of friends consisting of two to three guys. Vernon stated he never attended prom or social events. He also stated parties scared him because "If you go you have to interact". Vernon stated he did have crushes on girls in his class but never had the nerve to act on them. He graduated from West High class of 1963. Vernon reported he got drunk one time where he and his brother shared a fifth and another where he drank beer to excess. Vernon stated he did not like the feeling and only drinks an occasional beer to this day.

After graduation he worked for the Anchorage Times for a year and Northern Consolidated for a couple of years. In 1966 he joined the US Navy to avoid being drafted into the Army. He attended boot camp, mechanics school, and did one tour of duty stationed at Alameda. He reported that he did alright in the Navy and was discharged as a second class petty officer. When he returned to Anchorage he began working for Northern Consolidated and then Wein Airlines and built houses out of pocket. In 1980 he switched to longshoring and "twenty-five years later I was still living in the garage" of the home he was building. He stated his social network is his four brothers and their families. Vernon states his recreation is watching tv up to eight hours a day or reading.

**Analysis of Test Results:**
Vernon was administered the MSI-II to aid in a psychosexual assessment. He did not report a history of sexual or physical abuse. He reported an instance as a pre-teen where a man picked him up hitchhiking and wanted to engage in sexual touch. Vernon stated nothing happened. He did report he was a loner. Marital information indicates he has never been married. The reliability and validity scales noted an "acceptable limits" response set. Vernon reported he has accurate information about sexual anatomy and physiology. He believes his sexual development has been different than that of others. He reports he is heterosexual. Vernon did not report paraphilia interests or behaviors involving female apparel, bondage/discipline, sexual sadism, sexual masochism or any other paraphilias. He indicated he has always known it is wrong to either force someone to have sex or to engage a minor in sex. The results suggest he is highly inclined to experience apprehension and anxiety when in the company of

adult females. It appears that at the core of his social tension is the fear of being embarrassed and being seen as socially inadequate.

On the testing, Vernon indicated his has been accused of an offense involving pornography. He was highly disclosing of having been in possession of deviant pornography involving children. However, Vernon appears to seriously minimize ever have used deviant fantasies involving a child for sexual arousal.

Treatment candidacy is assessed based on the individual's degree of openness and disclosure about himself and his offense behavior, level of accountability for his actions, history of having the ability to control his behaviors and recognition of having a problem which needs treatment. Vernon's testing shows a potentially positive response to treatment in some respects. There is the necessary acknowledgment of having a sexual problem. He showed good effort and concentration in taking the lengthy MSI-II which is a positive in dealing with the demands of treatment. He does not appear to feel victimized, misunderstood, or mistreated in his responses. However, there are concerns about his amenability for treatment. For instance, he was minimally disclosing of having sexual interest in child pornography, does not understand the dynamics involved in his use of child pornography and does not indicate a need for counseling or treatment to control his sexual behavior.

Personality testing was provided by the administration of the MMPI-2. Vernon produced a valid, interpretable clinical profile. He responded to the test items in a generally frank and open manner.

Vernon's clinical scales were within normal limits. He thus views his current adjustment and ability to cope as adequate.

Content analysis of the items reveals Vernon reports some antisocial beliefs and attitudes as well as behavior in the past. He is likely to be intolerant and insensitive. Others may find him narrow-minded.

Interpersonally, Vernon appears shy with social concerns and inhibitions. He is a bit hypersensitive about what others think of him. His social relationships are likely to be viewed by others as problematic. He may be visibly uneasy around others and dislike social activities.

Vernon's clinical profile is within normal limits and no clinical diagnosis is provided.

The MCMI-III was administered to assess the long term, more enduring traits of the individual. This test complements the MMPI-2 on many scales, and reports symptoms in a format similar to the DSM-IV TR. Vernon may be experiencing an anxiety disorder based on his endorsement of symptoms such as fatigue, insomnia, muscular tension, distracted thinking, and a generally dysphoric mood.

6

   necessitate a long term therapeutic exploration of his history, his emotional detachment, and his sense of self.
3) Vernon should be redirected from use of the internet to social forms of engagement. He should be restricted from any access to the internet due to his use of pornographic web sites for the access and downloading of child pornography.
4) Vernon needs to be monitored in the community and not allowed unsupervised access to minor female children. There is no evidence to suggest he has acted on his deviant fantasies to date, but the capacity is there with his emotional detachment, and impairments in gaining adult social and sexual forms of gratification.
5) Upon release from intensive treatment, Vernon will need long-term follow up in the community with a D.O.C. approved provider in sexual offender treatment such as Roger Graves, Ph.D.

Bruce N. Smith, Ph.D.
Licensed Psychologist

*[signature] Bruce N. Smith, Ph.D.*

9